**STATE OF SOUTH DAKOTA, Plaintiff,**

v.

**Brock ADAMS, United States Secretary of Transportation; William M. Cox, Federal Highway Administrator; Arthur Johnson, Division Highway Administrator and The United States of America, Defendants.**

Civ. No. 77–3039.

United States District Court,
South Dakota, C. D.

April 9, 1980.

Ronald G. Schmidt, Sp. Asst. Atty. Gen., Pierre, S. D., for plaintiff.

Terry L. Pechota, Sioux Falls, S. D., Judith S. Scolnick, Dept. of Justice, Edward V. A. Kussy, Deputy Asst. Chief Counsel for Right of Way and Environmental Law Division, Federal Highway Administration, Washington, D. C., for defendants.

## MEMORANDUM OPINION

DONALD J. PORTER, District Judge.

### CASE SUMMARY

Plaintiff, the State of South Dakota, (State) seeks to overturn the final determination of the Secretary of Transportation (Secretary) under 23 U.S.C. § 131, (the Highway Beautification Act [Act]), that the State has not instituted effective control of billboards. The Secretary assessed a penalty of ten percent of the State's highway funds for 1978 and reserved the funds for 1979, to be returned to the State if the 1979 South Dakota Legislature complied with the Act. In accordance with the Act, § 131(b), the penalty for fiscal 1978 has been withheld and reapportioned to other states but cannot be distributed to such other states unless judgment should be rendered against the State in this action, and in Civ. 78–3051.

In this action, the State contends the Act is unconstitutional because: (1) It is not within the delegated powers of Congress; (2) it invades the powers reserved to the

states under U.S.Const., Amend. 10; (3) it places both adjudicatory and prosecutorial functions in the Secretary; (4) it unlawfully delegates legislative power to the states; (5) it violates the constitutional guarantee of a republican form of government; (6) it violates the Due Process Clauses of the U.S.Const., Amend. 5 and Amend. 14; (7) it violates freedom of expression guarantees of Amend. 1 U.S.Const.

In Civ. 78–3051, the State asserts that the Secretary abused his discretion and made his determination on a record with no substantial evidence to support the determination. These contentions are resolved against the State in a separate opinion of this court filed in Civ. 78–3051.

In the case at bar, the court now holds that the Act is constitutional and the State's request for a declaratory judgment to the contrary is therefore denied. Summary judgment shall be entered for defendants.

## FACTUAL BACKGROUND

The State of South Dakota has exhibited some reluctance to comply with the provisions of the Highway Beautification Act. In 1971, then Secretary of Transportation Volpe informed the State that its zoning of all areas around interstate and primary roads as commercial was not in compliance with the Act. The Secretary determined that the State was in violation of the Act. This determination was upheld on appeal. *South Dakota v. Volpe*, 353 F.Supp. 335 (D.S.D.1973). The ten percent penalty was returned in 1973, after the State complied with the Act.

The State Legislature passed compliance legislation in 1973, and the South Dakota Board of Transportation entered into an agreement with the Secretary's delegate, the Federal Highway Administrator. This agreement conformed to the Act and the administrative Rules under it, and also provided that billboards erected during the period of non-compliance were to be removed entirely at the expense of the State. This agreement was invalidated, however, when the South Dakota Supreme Court, in *Hogen*

*v. State Board of Transportation*, S.D., 245 N.W.2d 493 (1976) declared that the 1973 state statute constituted an impermissible delegation of legislative authority to the State Board of Transportation. There was no outdoor advertising control of any kind in South Dakota from September, 1976 to April 1, 1977.

The 1977 legislative session passed House Bill 786, and the governor signed it, in spite of the fact that the Secretary's delegate indicated objections to the bill and warned that passage of the bill could lead to loss of ten percent of the State's highway funds for any period when such law was in effect. On July 11, 1977, the Secretary notified the State of his preliminary determination that the State had not complied with the Act and that ten percent of the State's highway funds for fiscal 1978 and succeeding years would be reserved pending final determination of whether the funds would be withheld. The notification did not contain a detailed statement of reasons for the withholding of the funds. The State asked for a more particular statement and for an administrative hearing. The bill of particulars was received in September, 1977, and the hearing was held in December, 1977, before an Administrative Law Judge. The factual record was made before the Administrative Law Judge on December 12–15, 1977. The federal government was represented by the Federal Highway Administration. The Secretary took no part in this phase of the proceedings.

The State, on December 22, 1977, commenced two actions in this court. The first challenged the legality of the Secretary's 1977 reservation of funds, which reservation took effect on October 1, 1977. This action was decided adversely to the State in this court, and affirmed on appeal. *South Dakota v. Adams*, 587 F.2d 915 (8th Cir. 1978), *cert. denied*, 441 U.S. 961, 99 S.Ct. 2404, 60 L.Ed.2d 1065 (1979). The instant action, Civ. 77–3039, challenged the constitutionality of the Act and regulations under it.

The recommended decision of the Administrative Law Judge, issued in March, 1978,

noted discrepancies between South Dakota and federal law, but indicated that the discrepancies could be reconciled, either through negotiation between the Secretary and the State or through the State's application for an economic hardship exemption under 23 U.S.C. § 131(*o*). The Administrative Law Judge found that the State had made a good faith effort to comply with the Act, and recommended that the Secretary not withhold ten percent of the State's highway funds.

The Federal Highway Administration appealed this recommended decision to the Secretary on March 24, 1978, in accordance with 5 U.S.C. § 557(b), a part of the Federal Administrative Procedure Act. The State objected to this procedure as placing both the prosecutorial and adjudicative functions in the Secretary. The Secretary reviewed the record de novo, having concluded that he was not restricted by any presumption of correctness of the Administrative Law Judge's determination.

The Secretary's final Order of November 9, 1978, determines that the State's (1) directional sign regulation; and (2) regulation of signs more than 660 feet from the right-of-way, outside urban areas; and (3) its failure to enter into an adequate agreement under Section 131(d), place South Dakota out of compliance with the Act. The Order further determines that South Dakota's fiscal 1978 funds, previously reserved, are to be reapportioned to the other states. The fiscal 1979 funds were not to be reapportioned unless the State failed to enact effective billboard control by March 31, 1979. The State commenced Civ. 78–3051, seeking review of this order, on December 7, 1978.

In the time since the State brought the two actions now before the court, the legislature has passed, and the Governor has signed, legislation intended to insure compliance with the Act. 1979 S.D.Sess.L. Ch. 202, SDCL 31–29–61 through 87 (Supp. 1979). The State has, as of December, 1979, entered into an agreement with the Federal Highway Administration and most of the fiscal 1979 funds have been released to the State. The Secretary's order of November 9, 1978, requires that the fiscal 1978 funds be permanently withheld and redistributed to the other states. The redistribution is automatically stayed pending final judgment in Civ. 77–3039 and Civ. 78–3051. 23 U.S.C. § 131(*l*).

Both parties have moved for summary judgment, and filed briefs and memoranda in support of their motions. The court first heard oral argument in this case on August 10, 1979, at which time the State sought and was granted leave to file an amended complaint. The State also requested and was granted permission to file supplemental briefs in support of contentions made and refined in the amended complaint. The Secretary duly responded to these briefs and to the amended complaint. At the request of the State, further argument was heard on October 19, 1979, and the parties have filed further briefs and affidavits since that time.

## ISSUE

Is the Highway Beautification Act unconstitutional under any of the State's contentions?

## DECISION

### A. *Provisions of the Act Relevant to its Constitutionality.*

The Act provides that the Secretary has the power and duty to enforce its provisions. These provisions require a detailed regulatory program to be undertaken by each of the States. The program must be such as will provide "effective control" of roadside outdoor advertising. "Effective control" is defined with particularity in 23 U.S.C. § 131 and the regulations adopted under it by the Federal Highway Administration. Any State refusing to adopt regulation of billboards in accordance with federal standards is to have its federal highway funds reduced by ten percent. For purposes of the State's constitutional challenges, it is sufficient to point out that the requirements of the Act and the regulations are quite detailed, and that they *re-*

*quire* specific state regulation of billboards adjacent to interstate and primary highways before the State may receive one hundred percent of its federal highway funds. The requirements often conflict with the way in which the State of South Dakota would exercise its sovereign zoning powers in absence of such requirements.

23 U.S.C. § 131(*l*) requires the Secretary to preliminarily determine whether a state is in compliance with § 131. This must take place at least sixty days before a final determination is made. The State may request a hearing within the sixty-day period, and the Secretary must then issue his final determination after the hearing. The State may appeal the final determination to any district court for a district of that State. The filing of such an appeal stays the Secretary's order until final judgment in the appeal. The appeal vests the court with jurisdiction to affirm or reverse the Secretary's determination, in whole or in part, or to remand to the Secretary for further proceedings.

B. *Whether the subject matter of the Act is within the power of Congress.*

(1) Legal Background

■ The federal government may require that states institute certain regulatory measures or certain governmental programs in order to receive full funding under federal grants. This may be accomplished under the taxing and spending clause, also known as the general welfare clause, U.S.Const. Art. I, Sec. 8, cl. 1.[1] *Steward Machine Co. v. Davis*, 301 U.S. 548, 590, 57 S.Ct. 883, 892, 81 L.Ed. 1279 (1937).

■ Conditions placed on federal grants may be used to accomplish goals of the federal government provided certain tests are met. *First*, as the tax and spend clause itself indicates, the spending must be in the "general welfare." This means that an expenditure, if it seeks to accomplish certain federal goals, must accomplish goals that benefit society at large, and not a particular group. In *United States v. Butler*, 297 U.S. 1, 56 S.Ct. 312, 80 L.Ed. 477 (1936), for example, it was held that a tax on processors of food, the proceeds of which were to benefit only farmers, violated the rule that expenditures must be for the general welfare.

*Second,* conditioned grants must be "fairly within national power and policy," *Steward Machine, supra,* 301 U.S. at 590, 57 S.Ct. at 892. A conditioned grant will pass this test if it addresses a problem Congress could reasonably find to be national in scope, even if some of the aspects of the problem might have traditionally been addressed by state regulation.

*Third,* if the condition itself is not within national policy and power, it will not be invalidated if it is directed to the attainment of a lawful end, for which nation and state may cooperate. *Steward Machine Co. v. Davis, supra* at 593, 57 S.Ct. at 893. The means (condition) calculated to produce a result need not, therefore, be limited to those within federal power so long as the end sought to be accomplished is within the area which the federal government may address. For example, even though the federal government has no power over state employees, it may condition funds for the salaries of such employees on adoption by the State of regulations prohibiting partisan political activity by the State employees administering funds. This is so because the end of this condition, to ensure better public service by those administering federal funds, is an end within the powers of the federal government. *Oklahoma v. Civil Service Comm'n,* 330 U.S. 127, 143, 67 S.Ct. 544, 553, 91 L.Ed. 794 (1947).

■ A condition placed on a grant will be invalidated if its effect is to coerce the State to accept the condition and to deprive

---

1. Art. I, § 8, cl. 1, U.S.Const. This clause reads as follows:

The Congress shall have the Power ... To lay and collect Taxes, Duties, Imposts and Excises to pay the Debts and provide for the common Defence [sic] and general Welfare of the United States; but all Duties, Imposts and Excises Shall be uniform through the United States. . . .

the state of a choice. *Steward Machine, supra,* 301 U.S. at 589–90, 57 S.Ct. at 891–892. In *Steward Machine,* the court did not discuss the nature of coercion necessary to invalidate a condition because it found no coercion present. In *Oklahoma v. Civil Serv. Comm'n, supra,* 330 U.S. at 143–44, 67 S.Ct. at 553–554, however, the court held that where the State could avoid a penalty "by the simple expedient of not yield", that is, by foregoing the federal benefit to which a condition was attached, the condition was not coercive. As appears from the discussion following, it is unnecessary in this case to determine under what conditions coercion might be found. The language of *Oklahoma v. Civil Service Comm'n,* however, suggests that conditional grants might *never* be coercive.

(2) Whether the Act is within the "General Welfare"

The court concludes that the Act could reasonably be found to be in furtherance of the general welfare. The discretion vested in Congress to determine what is in the general welfare is "quite expansive." *Buckley v. Valleo,* 424 U.S. 1, 90, 96 S.Ct. 612, 668, 46 L.Ed.2d 659 (1975). Congress has stated that its reasons for seeking State regulation of billboards were to protect the public interest in the highways, and promote the scenic and recreational value of the highways, and promote safety on the highways. These are national goals, benefitting all of society, not just a particular group. This is especially true in light of the fact that the construction of these highways is financed almost entirely by federal funds.

The scope of the courts inquiry in determining whether a grant and conditions attached to it are in the general welfare is narrow. *See Buckley v. Valleo, supra.* Congress has the benefit of hearings, legislative and executive branch studies and the views of all segments of society in deter-

mining what is in the general welfare. This court cannot utilize such fact-finding processes, and is not constituted, as is Congress, to express the national policy through the enactment of statutes. Even if this court were to disagree on the wisdom of the Act, it may not, in this case, substitute its judgment for that of the Congress on the question of whether the Act is for the "general welfare."

(3) Whether the Act is within the National power and Policy.

Regulation of roadside outdoor advertising, if within the scope of national policy and power, would be brought there by Congress' power over interstate commerce, U.S. Const., Art. I, Sec. 8, cl. 3.[2] There can be little doubt that outdoor advertising signs along interstate and primary roads affect interstate commerce. Such signs are intended to exert influence on the traveling public. Public travel is part and parcel of interstate commerce. *See Heart of Atlanta Motel v. United States,* 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964). The highways are channels of interstate commerce. Their construction is largely financed by federal taxation. Congress' intent that roadside advertising be regulated is clearly shown by the Act itself.

The State's contention is, however, that direct regulation of billboards by the federal government would usurp the reserved powers of the states and thus contravene U.S.Const., Amend. 10.[3] A subject can be a national problem and yet be beyond Congress' power as violative of this amendment. *National League of Cities v. Usery,* 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976). In this regard, a distinction must be made between congressional regulation that directly affects the State's governmental functions, (such as enforcement against State Government of maximum hours—minimum wage requirements for State em-

---

**2.** This clause reads as follows:

The Congress shall have Power ... To regulate commerce with foreign nations, and among the several states and with the Indian Tribes ....

**3.** This amendment reads as follows:

The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.

ployees), and regulation that does not affect the State in its sovereign capacity.[4] *National League of Cities, supra,* concerned federal regulations that directly affected rendition of state governmental services by a state. Federal regulation of billboards, on the other hand, directly affects only the landowner and advertiser, rather than the State itself in its sovereign capacity.

The State contends that such a regulation of billboards would "impermissibly interfere with [its] integral governmental functions ...", *National League of Cities, supra,* at 851, 96 S.Ct. at 2474, by displacing the state's traditional control over land use planning and zoning. It is inevitable that any federal regulation intruding on areas once controlled by the states will diminish the states' power in the area. So long as the *activity regulated* (in this case, outdoor advertising) is not a traditional state function, the Tenth Amendment and *National League of Cities, supra,* will not prohibit Congress from regulating the activity. If it were otherwise, Congress could never extend federal regulation of private business (as distinguished from regulation of the state as a state) to any area previously controlled by the states, because any such extension would, under the State's argument, violate the Tenth Amendment. That Congress' power is not so severely limited is shown by a multitude of decisions from the United States Supreme Court, including: *Katzenbach v. McClung,* 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964); *Heart of Atlanta Motel, supra; Wickard v. Filburn,* 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942); *United States v. Darby,* 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609 (1941); *N.L.R.B. v. Jones & Laughlin Steel Corp.,* 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893 (1937); *Stafford v. Wallace,* 258 U.S. 495, 42 S.Ct. 397, 66 L.Ed. 735 (1922). It is also worth noting that the narrow view taken by cases such as *Carter v. Carter Coal Co.,* 298 U.S.

238, 56 S.Ct. 855, 80 L.Ed. 1160 (1936) and *Hammer v. Dagenhart,* 247 U.S. 251, 38 S.Ct. 529, 62 L.Ed. 1101 (1918) has been specifically repudiated by the later cases.

The State places reliance on the case of *United States v. Butler, supra.* The rationale of this case, however, has been significantly undermined by subsequent cases, particularly *Steward Machine Co. v. Davis, supra,* 301 U.S. at 592–93, 57 S.Ct. at 893–894 and *Oklahoma v. Civil Service Comm'n, supra.* Even *Butler* does not support a legal conclusion that the Highway Beautification Act is unconstitutional. *Butler* held unconstitutional a tax designed to influence or regulate agricultural production. An essential part of this holding was the court's conclusion that Congress had no power to directly legislate so as to control agricultural production. The subject of agricultural production was viewed, in 1936, as outside the scope of national power and policy. This view no longer controls, since later congressional enactments in the area of agricultural production have been upheld. See *Wickard v. Filburn, supra.* In addition, by levying a specific tax on a specific industry and appropriating funds for the benefit of that industry, Congress was seeking to tax and spend for particular, rather than general, welfare. The farmers in *Butler,* the Supreme Court found, were being coerced to conform their production to a federal standard. The state could not freely exercise its reserved powers to police production within its borders, it was held, so long as the federal government coerced farmers into following a federal program. Finally, the State in *Butler* had no choice; it could not avoid the operation of the Agricultural Adjustment Act by "the simple expedient of not yielding", *Oklahoma v. Civil Service Comm'n, supra,* 330 U.S. at 143–44, 67 S.Ct. at 554.

The Highway Beautification Act does not suffer from any of these infirmities. There

---

4. In *National League of Cities, supra,* Congress had extended minimum wage provisions of the Fair Labor Standards Act to state and local employees. The states and localities were thus *required* by Congress to pay certain wages. They were given no choice in the matter. Here,

of course, the State of South Dakota could choose to persist in its refusal to enact compliance legislation, although at this time it appears that the State has chosen to comply. *See* SDCL 31–29–61 through 87 (Supp.1979).

is no spending for the benefit of any particular group, but instead, the subject of outdoor roadside advertising along interstate and primary highways is within the national interest, and it was within the power of Congress and the President to declare such a public policy by statute. ' This case does not present a fact situation of misuse of the tax and spend power to accomplish something the federal government has no right to do otherwise. The State need not comply, and may cease to comply at any time. *See Steward Machine Co. v. Davis, supra*, 301 U.S. at 592–93, 57 S.Ct. at 893–894.

#### (4) Whether the Condition is Directed to the Attainment of a Lawful End

The court also finds and concludes that the end of the grant is within the power of Congress, and that the condition is reasonably adapted to that end. The Congress as indicated above, could choose to regulate outdoor advertising along interstate and primary highways. Withholding part of the highway funds of a state that refuses to regulate such advertising is a means calculated to produce regulation of such advertising. As cases cited elsewhere in this opinion indicate, it is a legitimate means to bring about an end, if the end is within the power of Congress. The end, in this case, is within Congressional power.

#### (5) Whether the Condition Amounts to Coercion.

The State's next contention is that even if the federal government could regulate billboards directly, it could not "commandeer" the State's police power and coerce the State to regulate on behalf of the federal government, *citing District of Columbia v. Train*, 521 F.2d 971 (D.C.Cir.1975) *vacated and rem.*, 431 U.S. 99, 97 S.Ct. 1635, 52 L.Ed.2d 166 (1977) and *Brown v. Environmental Protection Agency*, 521 F.2d 827 (9th Cir. 1975), *vacated and rem.*, 431 U.S. 99, 97 S.Ct. 1635, 52 L.Ed.2d 166 (1977), *opinion after rem.*, 566 F.2d 665 (1977). It is well settled, however, that the federal government may require the State to comply with certain conditions in order to obtain funds that the federal government grants to the State. *Steward Machine Co. v. Davis, supra.* The cases cited by the State recognize this principle. These cases dealt with the attempt by the Environmental Protection Agency to *impose* certain federal regulations on the states by forcing the states, through *direct regulation* to control certain types of automobile pollution. In *Brown* and *Train*, the agency attempted to impose a federal regulatory scheme through which states were *required* to adopt certain regulations or suffer federal sanctions. The states were given no option. The applicability of these holdings to the present case, in which the states *were* given an option (although a painful one) is thus doubtful at best, as the court recognized in *Brown*, 521 F.2d at 840:

> Our interpretation is in no way inconsistent with the recognition that Congress has the power to authorize the Administrator to obtain the consent of a reluctant state by conditioning certain federal expenditures within that state on the granting of such consent. *See Steward Machine Co. v. Davis*, 301 U.S. 548, 57 S.Ct. 883, 81 L.Ed. 1279 (1937).

There is a vast difference between *requiring* a state to adopt certain regulations and denying funding to a state that refuses to adopt them.

This distinction was recognized in *Texas Landowners Rights Ass'n v. Harris*, 453 F.Supp. 1025, 1028–31 (D.D.C.1978), *aff'd mem.*, 598 F.2d 311 (D.C.Cir.1979), *cert. denied sub. nom. Texas Landowners Rights Ass'n v. Director, Federal Emergency Management Agency*, 444 U.S. 927, 100 S.Ct. 267, 62 L.Ed.2d 184 (1979), a *post-National League of Cities v. Usery, supra*, case. In *Texas Landowners*, the State of Missouri, forty political subdivisions in twelve states, and thirty individual landowners within federally designated flood zones brought suit against federal officials administering the federal flood control program. The portion of this Act alleged to offend the Tenth Amendment required that local governments adopt certain flood plain building regulations under their police powers on pain of losing federal financial assist-

ance for acquisition or construction purposes within non-participating communities. This sanction included denial of FHA and VA home mortgages in affected communities. The plaintiffs in *Texas Landowners, supra,* argued, as does the State in this case, that the severity of the sanctions was such that the "choice" represented no choice at all, but only coercion. The court rejected this contention, holding that coercion is to be found only where the federal government gives the states no choice, but mandates compliance as in *Brown* and *Train.* This was essentially the holding of *Steward Machine Co. v. Davis, supra,* at 589–90, 57 S.Ct. at 891–892.

█ Further, the court is not convinced that the conditioned grant in this case is coercive. The very fact that the State of South Dakota chose not to enact billboard compliance legislation after having been specifically warned of the ten percent penalty shows as much. In addition, congressional debates cited by the Secretary show a definite intention not to be coercive. Congress had originally planned to withdraw all highway funds from non-complying states, but the amount was reduced to ten percent in order to give the states a choice. It is plain that the State could avoid the alleged coercion by the simple expedient of not complying. *Oklahoma v. Civil Serv. Comm'n, supra,* 330 U.S. at 143–44, 67 S.Ct. at 553–554. This court therefore concludes that the Act does not violate the Tenth Amendment.

C. *Whether the Secretary's statutory role as decision-maker violates due process when considered in light of his other administrative duties.*

█ The Act provides that the Secretary must make a preliminary determination of whether to withhold funds from a state at least sixty days before the final determination is made. During this sixty-day period, the State may request a hearing, and after the hearing is held, the Secretary is required to make his final determination of whether the funds should be withheld.

The State contends that the fact that the Secretary has power to make both the initial and final decision and the fact that the Secretary is the official with supervisory powers over the Federal Highway Administration, which was the agency seeking enforcement, constitutes a violation of due process. This is said to be the case because the Secretary is cast in the role of both advocate and decision-maker. 5 U.S.C. § 557 prohibits ex parte communications with decision-makers. Supervision and direction of the advocates by the decision-maker would thus be unacceptable and could constitute a violation of due process. There is no evidence on the record, however, that such abuses have taken place. Plaintiffs have offered none and do not now ask for an opportunity to do so. When a party challenges the regularity of administrative proceedings, that party has the burden of proving irregularity. In absence of such proof, it is presumed that administrative proceedings have been properly conducted. *See Hortonville Joint Sch. Dist. No. 1 v. Hortonville Ed. Ass'n,* 426 U.S. 482, 96 S.Ct. 2308, 49 L.Ed.2d 1 (1976); *Withrow v. Larkin,* 421 U.S. 35, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975). These cases also clearly hold that, absent evidence of abuse or bias, the combination of initial decision-making power with that of making a final determination does not violate due process.

D. *Whether the Act Unconstitutionally delegates Congressional authority.*

█ The State's next constitutional contention is that Congress, in passing the Act, delegated authority to regulate outdoor advertising to the states without appropriate standards, when it should have regulated outdoor advertising on its own. The State cites *Schechter Poultry Co. v. United States,* 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935) for the proposition that valid Congressional delegation may be made only to officials of the National Government. This principle is indeed contained in the cited case, but it is inapplicable here. As the Secretary points out, the Congress has not directly regulated outdoor advertising,

and has not authorized the states to do so. The State's authority to regulate outdoor advertising, or to fail to do so, flows entirely from the State's own sovereignty. That Congress might encourage or induce the State to exercise its sovereignty does not convert that exercise of state sovereignty into an invalid exercise of improperly delegated federal sovereignty. The State is, whether successfully or unsuccessfully, induced to exercise its own sovereignty and not some power delegated to it by the United States Congress. This contention is rejected.

### E. *First Amendment Contention.*

 The State also contends that the Act violates free speech guarantees of the first amendment, United States Constitution. The State correctly points out that commercial speech has recently been given first amendment protection. *Virginia State Board of Pharmacy v. Virginia Citizens' Council,* 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976). We are not, however, required to consider this contention, since the State lacks standing to assert the first amendment rights, if any, of advertisers. The United States Supreme Court has held that a litigant must assert his *own* legal rights and interests, and cannot rest his claim for relief on the rights of others. *Warth v. Seldin,* 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). Here, the State seeks to assert the rights of persons otherwise free to advertise. It cannot do so. Such advertisers must assert their own rights, if any. It is noted that 23 U.S.C. § 131 excludes official state signs, and it thus appears that the State is not being deprived of free speech.

In addition, the State cannot assert this claim as *parens patriae* for its citizens. The State has standing to sue under this doctrine only when "its sovereign or quasi-sovereign interests are implicated and it is not merely litigating as a volunteer

the personal claims of its citizens" *Pennsylvania v. New Jersey,* 426 U.S. 660, 665, 96 S.Ct. 2333, 2336, 49 L.Ed.2d 124 (1976). In this case, the other contentions of the State obviously involve its sovereign powers. The alleged First Amendment rights, however, are only those of the individual citizens who might choose to erect outdoor advertising. The State is, at best, only a volunteer as to these claims and may not, therefore, successfully assert them.

### F. *Additional Constitutional Contentions.*

The State makes a number of additional constitutional contentions. Among these are due process and equal protection challenges, additional arguments based on improper delegation of legislative authority, and a contention that the Act violates the Republican Form of Government Guarantee Clause, U.S.Const. Art. IV, § 4.[5] The court has carefully considered these challenges. Those other than the guarantee clause challenge are rejected, particularly in view of the fact that the State has cited no authority for its position on these challenges. The guarantee clause challenge is rejected because, as the United States Supreme Court recognized in *Baker v. Carr,* 369 U.S. 186, 223–26, 82 S.Ct. 691, 713–715, 7 L.Ed.2d 663 (1962) such challenges raise non-justiciable political questions.

### CONCLUSION

The court specifically finds and concludes that the Highway Beautification Act is constitutional, and that there is no merit in the State's constitutional contentions. The State's request for a declaratory judgment is denied; the Secretary's motion for summary judgment is granted; and an appropriate order will be entered.

---

5. This clause reads as follows:

The United States shall guarantee to every State in this Union a Republican Form of Government, and shall protect each of them against Invasion; and on Application of the Legislature, or of the Executive (when the Legislature cannot be convened) against domestic Violence.